**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**ASHLAND**

**Civil Action NO. 18-93-HRW**

**JULIE HELPHENSTINE,**
***Administratrix of the Estate of***
**CHRISTOPHER DALE HELPHENSTINE**
**and** *Guardian of B.D.H.*                                             **PLAINTIFF,**


**v.**                       <u>**MEMORANDUM OPINION AND ORDER**</u>


**LEWIS COUNTY KENTUCKY,**
**JEFF LYKINS,** *Individually,*
**ANTHONY RUARK,** *Individually,*
**ANDY LUCAS,** *Individually,*
**BEN CARVER,** *Individually,*
**AMANDA MCGINNIS,** *Individually,*
**SANDY BLOOMFIELD,** *Individually,*
**MARK RILEY,** *Individually,*
**MELINDA MOORE,** *Individually,*
**JEFFREY THROUGHMAN,** *Individually,*
**and**
**TOMMY VON LUHURTE, D.O.,** *Individually,*                       **DEFENDANTS.**


On April 14, 2017, Christopher Helphenstine was arrested and transported to the Lewis County Detention Center. He died five days later while in detention. This case is about what unfolded during those five days.

Plaintiff Julie Helphenstine, the wife and Administratrix of the Estate of Christopher Helphenstine, and guardian of their minor child, filed this lawsuit against Lewis County and a number of Lewis County officials and employees in their individual capacities, including Jailer Jeff Lykins; Deputy Jailers Anthony Ruark, Andy Lucas, Ben Carver, Amanda McGinnis, Sandy

Bloomfield, Mark Riley, and Jeffrey Thoroughman; Sheriff Johnny Bivens; and Deputy Sheriff John Byard (collectively, "Lewis County Defendants") and Tommy Von Luhrte, D.O. [Docket No. 1]. Pursuant to 42 U.S.C. § 1983, Plaintiff alleges that the Defendants were deliberately indifferent to Helphenstine's medical needs, thereby violating his rights under the Eighth and Fourteenth Amendments. In addition, Plaintiff asserts claims of negligence, gross negligence, and wrongful death under Kentucky law.

Defendants seek summary judgment. For the reasons set forth herein, the Court finds that Defendants are entitled to judgment as a matter of law as to the §1983 claims.

## I.

The facts are mostly undisputed. On February 12, 2017, Christopher Helphenstine sold three bins of heroin to a person who was cooperating with the Lewis County Sheriff's Office. [Arrest Warrant, Docket No. 96-1]. On March 7, 2017, he sold four bins of heroin to another person who was cooperating with the Lewis County Sheriff's Office. *Id.* A warrant was obtained and on Friday, April 14, 2017, Helphenstine was arrested for trafficking in a controlled substance, first degree. *Id.*

At the time of his arrest, Helphenstine had a pill he said was Xanax without indicia that the pill had been prescribed to him; thus, the arresting officer also charged Helphenstine with possession of a controlled substance, third degree. [Citation, Docket No. 96-3].

### A.  Friday, April 14, 2017.

Helphenstine was taken to the Lewis County Detention Center ("LCDC") at 2:10 p.m. [Facility Admission Report, Docket No. 96-4]. Helphenstine remained at the LCDC without incident until approximately 8:30 p.m. on Sunday, April 16, 2017. [Incident Report, Docket No. 96-5].

2

**B.  Sunday, April 16, 2017.**

On Sunday, April 16 around 8 p.m., Deputy Jailer Mark Riley was conducting rounds when an inmate called out to him about someone being sick in a cell. [Deposition of Mark Riley, Docket No. 107, p. 8-9]. Deputy Riley entered the cell, saw Helphenstine and saw vomit on the floor. *Id.*  Deputy Riley asked Helphenstine if he wanted to see the doctor or go to the hospital, but Helphenstine said no. *Id.* at p. 10.   Riley testified that Helphenstine told him that he was "dope sick" and "just wanted to be in a cell by hisself [sic] so he can get over it." *Id.* and Docket No. 95-5. Deputy Riley moved Helphenstine to a medical isolation cell where he could be monitored and completed an Incident Report in order to advise other jail personnel about the reasons for the move. [Docket No. 96-5].

Helphenstine was placed in the medical isolation cell at approximately 9:00 p.m. [Medical Watch Sheet, Docket No. 96-6].

**C.  Sunday, April 16, 2017, 9:00 p.m. – Tuesday, April 18, 2017, approximately 9:30 a.m.**

Beginning at 9:20 p.m. on Sunday, April 16, deputies Sandy Bloomfield, Jeffrey Thoroughman, Ben Carver, Anthony Ruark, and Amanda McGinnis took turns, during their respective shifts, checking on Helphenstine approximately every 20 minutes, by opening a flap in the door to the isolation cell, looking into the cell, and talking to Helphenstine. [Deposition of Sandy Bloomfield, Docket No. 108, p. 41].  They then noted their observations on a Medical Watch sheet that hung from the door of the isolation cell. [Docket No. 96-6]. At various times through the early morning of April 18, deputy jailers noted that Helphenstine was laying down,

sitting up, eating, talking, moving, or, occasionally, vomiting.[1] *Id.*   There are a total of 173 entries from 9:20 a.m. on April 16 to 3:30 a.m. on April 19.

Shortly after midnight on April 18, Deputy McGinnis completed a Medical Request Form and faxed it to Dr. Tommy Von Luhrte, a local physician under contract with the Lewis County Fiscal Court to provide medical services to inmates at the LCDC [2]. [Deposition of Amanda McGinnis, Docket No. 98, p. 40-41]. On the form, she noted that Helphenstine was soiling himself, vomiting and refusing to eat or drink. [Medical Request Form, Docket No. 96-7].

Helphenstine's arraignment was scheduled for mid-morning on April 18. Because he had vomited, deputy jailers took him down the hall so he could shower. [Docket No. 98, p. 22]. The medical log sheets show he was in the shower from 6:10 -7:05 and back in his cell, sitting up at 7:35. [Docket No. 96-6].

As Helphenstine was getting ready to shower, Deputy McGinnis spoke with him. [Docket No. 98, p. 22]. He told her he did not feel well.  *Id.*  She also knew he had been vomiting, but also that he had consumed some juice and some water that morning. *Id.* at p. 30. While he showered,  Deputy McGinnis retrieved a new set of clothes and bedding for him. *Id.* at  p. 22.

 The log sheet reflects that before showering, at 5:45 a.m., Helphenstine drank some juice; at 6 a.m. he drank some water.  [Docket No. 96-6].  After showering , at 7:50 a.m. he ate part of a breakfast tray. *Id.*

### D.  Tuesday, April 18, 2017, between 9:22 a.m. and 11:10 a.m.

Shortly thereafter, jail staff began gathering those inmates who were due in court for their arraignments, including Helphenstine. [Deposition of Jeff Lykins, Docket No. 103, p. 56]. Jailer

---

[1] When a log sheet became completely filled, that sheet was removed from the door and placed in an inmate's file. [Deposition of Ben Carver, Docket No. 101, p. 16-17]. A new log sheet was then placed on the door of the cell for deputies to continue noting their observations. *Id.*
[2] *See* Medical Services Agreement, Docket No. 96-8.

Jeffrey Lykins called Helphenstine's name to get him to come to the door of his cell.  *Id.*  He

opened the cell door, handcuffed Helphenstine, and walked with him and other inmates to the

back door of the LCDC to meet the bailiffs who would take the inmates approximately 20 feet to

the courthouse. *Id.* Lycans testified that Helphenstine "looked okay. I mean he looked fine where

he was in his jumpsuit. Nothing noticeable about how he was walking."  *Id.* at 59, 60-61.

Among the bailiffs who received the group of inmates was Lewis County Deputy Sheriff

John Byard. [Deposition of John Byard, Docket No. 105, p. 10].  Byard noted that Helphenstine

was lethargic in his movement and in his speech. *Id.* at p. 18.  After escorting the inmates,

including Helphenstine, to the courtroom, Deputy Byard approached Lewis County District

Judge McCloud and told him that Helphenstine was "out of it" and appeared to be in withdrawal.

Judge McCloud told Deputy Byard to return Helphenstine to the LCDC. [Video of Arraignment,

Docket No. 97]. Immediately thereafter, Deputy Byard returned Helphenstine to the LCDC.

[Docket No. 105, p. 19]. A deputy was present at the LCDC to receive Helphenstine, but Deputy

Byard cannot recall whom. *Id.* at p. 21. Deputy Byard told the deputy jailer that Helphenstine's

arraignment had been canceled by the judge but did not specify the basis for the cancellation. *Id.*

The medical log sheet reflects that Helphenstine was observed back in his cell at 10:38, laying

down. [Docket No. 96-6].

At 11:10 am, Defendant Melissa Potter, the Jail's "medical coordinator," directed that

deputy jailer Melinda Monroe fill out another medical request for Helphenstine and fax it to Dr.

Von Luhrte's office.  [Deposition of Melissa Potter, Docket No. 121, p. 20 and 35]. In that

request, Monroe said that Helphenstine was "detoxing from drug use," was "vomiting badly,"

and had "not [been] able to eat or drink for a few days now." She added: "He needs to be seen by

Dr. Tommy [Von Luhrte]." [Docket No. 124-11].  Dr. Von Luhrte testified he never received this fax.  [Deposition of Tommy Von Luhrte, D.O., Docket No. 102,  p. 108-109].

**E.  Tuesday, April 18, 2017, late morning through end of the day.**

At some point during the day on April 18, 2017, Dr. Von Luhrte reviewed the Medical Request Form that Deputy McGinnis had completed.  *Id.* at p. 81.  He then contacted the jail and spoke with someone whose identity he does not know. He told the person to take Helphenstine to the emergency room.  *Id.* at 85.  Dr. Von Luhrte testified that he was informed that Helphenstine refused to go to the hospital. *Id.*

He further testified that because Helphenstine would not go to the emergency room, he completed the "Doctor's Orders" section of the form and returned it to jail staff, advising them to encourage Helphenstine to sip Kool Aid and eat popsicles, to administer Reglan, and give him bland foods such as saltine crackers, bread, or chicken noodle soup.  *Id.* at  p. 81, 83 and Docket No. 96-10.

At 3:00 p.m. on April 18, 2017, jail staff, following Dr. Von Luhrte's orders, gave Helphenstine a generic form of Reglan, as  well as Zofran, which is used to treat nausea. [Medication Dispense Form, Docket No. 96-11].

Dr. Von Luhrte testified that he received another call from someone who identified themselves as the "Jailer" regarding Helphenstine. [Docket No. 102, p. 116, 127].  He stated that he told the "Jailer" to transport Helphenstine to the hospital two times but, again, that he refused to go. *Id.* It is unclear from the record to whom Dr. Von Luhrte spoke as none of the defendants recall this conversation and County Jailer Jeff Lykins specifically denies it. [ Docket No. 103, p. 65].

Dr. Von Luhrte testified that he typically visits the LCDC on Tuesdays. [Docket No. 102, p. 48]. However, although April 18, 2017, was a Tuesday, and there is no record that he came to the LCDC on that day.  At various times between 3:00 p.m. and 11 p.m., deputy jailers noted that Helphenstine was sitting up, talking, lying down, or standing in the medical observation cell. [Docket No. 96].

At approximately 9:00 p.m. Deputy Andy Lucas saw Helphenstine in the isolation cell. [Docket No.22]. Helphenstine was sitting up and alert but told Deputy Lucas that he was "not going to drink anymore whiskey again." *Id.*  Two hours later, at 11:00 p.m. on Tuesday, Deputy Lucas was going off shift for the evening and he walked past the medical isolation cell on his way out of the facility. [Deposition of Andy Lucas, Docket No. 99, p. 7].  He saw Helphenstine standing near the cell door talking with Deputy Ruark.  *Id.*  Deputy Lucas asked Helphenstine how he was feeling, and Helphenstine said he was "feeling a whole lot better. And he said he'd like to have something cold to drink." *Id.*  Lucas further testified that "I brought him a Mountain Dew. And he took – he drank some of that, and he said, 'I'm feeling pretty good now' and I said, 'Okay.' " *Id.*  at p. 8-10.

Deputy McGinnis arrived for her shift at 11 p.m. and was told that Dr. Von Luhrte had prescribed Helphenstine anti-nausea and anti-vomiting medicine, and that he seemed to be doing better. [Docket No. 98, p. 61-62].  She observed that he appeared better, as he was up and moving around more than he had been the previous night. *Id.*

### F.  Wednesday, April 19, 2017.

The record contains a video of the events occurring on April 19. [Docket No. 126]. The video shows that shortly after midnight,  Helphenstine is lying face down on the bunk in the medical observation cell. For approximately two hours, he remained laying down, his legs

twitching periodically, and he can be seen raising and shaking his feet. [Docket No. 126]. According to medical log sheet, he was observed at 12:03 "sitting and shaking," at 12:15 "laying down," at 12:30 "laying down," at 12:43 "laying down," at 1:01 "laying down," at 1:25 "moving," at 1;53 "moving," at 2:04 "laying down with legs moving," and at 2:15 "laying down," and at 2:35 "laying down." *Id.*

Around 2:42 a.m., Deputy Ruark entered the cell to manually check on Helphenstine. [Docket No. 126]. After doing so, Deputy Ruark left the cell briefly to retrieve a pair of gloves and a drink, which he offered to Helphenstine. While Helphenstine turned his head to the left to interact with Deputy Ruark, he refused the drink. *Id.* He laid his head down again, and the deputy exited the cell at around 2:45 a.m. *Id.*

At approximately 2:46 a.m., Deputy Ruark re-entered the cell, leaned down very close to Helphenstine, and offered him something to drink. *Id.* Deputy Ruark spoke with Helphenstine, and, on video, Helphenstine shakes his head very slightly to indicate "no" during parts of the conversation. *Id.*

At 2:50 a.m., Deputy McGinnis entered the cell, and within seconds, a third deputy jailer appears – from the shadow and shoe that are visible in the camera frame – to be standing in the doorway to the cell. *Id.*

Deputy McGinnis left the cell briefly to retrieve a bottle of Ensure, and, upon returning to the cell, knelt down beside Helphenstine, spoke to him, and offered him a drink through a straw. Helphenstine consumed a small amount of the Ensure. *Id.* and Docket No. 98, p. 37-38. The deputies left the cell at around 2:53 a.m. [Docket No. 126].

At approximately 2:56 a.m. Deputy McGinnis re-entered the cell, knelt down next to Helphenstine, and he took a drink through a straw from a white bottle. *Id.*

At 3:13 a.m., Deputy McGinnis went to the door of the cell and looked through the window to check on Helphenstine, noting that he had consumed some Ensure. [Docket No. 96-6].

At approximately 3:29 a.m., Deputy Ruark asked Deputy Thoroughman to open the door to the cell and try to get Helphenstine to respond to him. Deputy Thoroughman stood in the doorway and yelled "Chris" four or five times. Deputy Ruark and Deputy McGinnis joined Thoroughman in the cell at approximately. Deputy Ruark told Deputy Thoroughman to relieve Deputy Bloomfield from the Control Room, so that Deputy Bloomfield could enter the cell to try and get a response from Helphenstine. She could not. Bloomfield testified that Helphenstine was blue, cold, and unresponsive. [Docket No.108, p. 81, 97].

They summoned an ambulance and Ruark, McGinnis and Thoroughman performed CPR on Helphenstine until it arrived at approximately 3:40 a.m.

Unfortunately, moments later, Helphenstine died in the ambulance on the way to the emergency room. The immediate cause of death is listed as "acute (fentanyl) and chronic drug abuse." [Kentucky Certificate of Death, Docket No. 96-21].

### G.  LCDC Polices

As Plaintiff points out, Lewis County has a statutory responsibility to attend to the medical needs of inmates in its jail. KRS 71.040, 441.025.  Kentucky law requires that inmates in county jails be provided "[e]mergency medical, vision, and dental care ... commensurate with the level of care available to the community," and further states that "[i]f emergency medical care is needed, it shall be provided." 501 KAR 3:090(13) and (21). To that end, Lewis County had written policies and procedures in place that addressed the medical needs of inmates in its Jail. In her response to Defendants' dispositive motions, Plaintiff attaches three documents which

pertain to LCDC's policies for medical care for inmates. The first is the "EMS" Policy which provides:

> Emergency Medical Services are available 24 hours a day to inmates of the Lewis County Jail to ensure prompt emergency medical attention. All deputies are trained to respond to medical emergencies since an inmate's life may depend on appropriate first aid.

[Docket No. 124-3].

"Emergency" is defined in the policy and incudes "drug or alcohol withdrawal." *Id.* The Policy states that a deputy confronted with an emergency will "administer first aid" and "call the Jail Medical Coordinator and the Facility Physician." *Id.* It further states that "when necessary and/or possible, jail deputy shall move the inmate to a holding cell or remove other inmates from the scene…." *Id.*

The other two documents pertain to prisoner transportation and court security. Both provide that in the event of a medical emergency, deputies are to summon EMS or "seek medical attention". [Docket Nos. 124-9 and 124-10]. "Medical emergency" is not defined in either document.

## II.

A set forth *supra*, Helphenstine's estate filed this lawsuit and the parties have conducted extensive discovery. The Lewis County Defendants seek summary judgment as to all claims alleged against them [Docket No. 96]. Dr. Von Luhrte seeks summary judgment as to the § 1983 claim and as to Plaintiff's claims for the destruction of power to earn income [Docket Nos. 74 and 94]. All motions have been fully briefed and are ripe for review.

10

### III.

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317. 323 (1986). That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Id*.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the non-moving party is required to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV.

 "[P]retrial detainees have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment." [3] *Greene v. Crawford Cnty.*,  22 F.4th 593, 605 (6th Cir. 2022).

---

[3]     In a §1983 analysis, convicted prisoners and pretrial detainees have different protections. Convicted prisoners' claims are analyzed under the Eighth Amendment, whereas pretrial detainees' claims are analyzed under the Fourteenth Amendment. *See generally*, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).  In *Kingsley*, the Court rejected the subjective component of the deliberate-indifference standard under the Eighth Amendment, holding that the relevant inquiry is whether the force purposely or knowingly used against the prisoner was objectively unreasonable. *Id.* at 398;  *Kingsley* however left confusion in its wake.  After *Kingsley*, courts struggled over whether the new, objective standard of *Kingsley* applied to Eighth Amendment claims other than claims of excessive force. Until last fall, the Sixth Circuit routinely applied the Eight Amendment's deliberate indifference standard to claims made by detainees. *See e.g.*, *Richmond v. Huq, et al.*, 885 F.3d 928 (6th Cir. 2018). But in *Brawner v. Scott Cnty.*, 14 F.4th 585 (6th Cir. 2021),  the Sixth Circuit considered if and how *Kingsley* applied in a case involving allegations of inadequate medical care for a pretrial detainee. The court held that *Kingsley* required a modification of the deliberate-indifference standard for pretrial detainees, because the deliberate-indifference standard flowed from the Eighth Amendment's prohibition on cruel and unusual punishments and, as such, is not automatically applicable to the Fourteenth Amendment. *Id*. at 596. In applying *Kingsley*, however, the Sixth Circuit did not impose a strictly objective test for conditions-of-confinement claims; it modified the subjective component of the test. The court held that, as with Eighth Amendment claims, negligence is not enough. *Id.* at 597. Instead, a recklessness standard applies. *Id.* Nevertheless, that recklessness standard is different than the recklessness standard observed in Eighth Amendment cases, which is taken from the criminal law.

The Sixth Circuit recently clarified what, exactly, is required in order to maintain an inadequate-medical-care claim under the Fourteenth Amendment.  "A plaintiff must satisfy three elements: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk."  *Trozzi v. Lake County Ohio*, 29 F.4th 745, 757 (6th Cir. 2022).

**A.**

The objective component of the Fourteenth Amendment analysis requires proof that the detainee had a sufficiently serious medical need.  *See generally, Griffith v. Franklin County,* 975 F.3d 544, 567 (6th Cir. 2020).  Plaintiff  appears to contend that withdrawal, from any substance, at any stage and for every detainee, qualifies as a "sufficiently serious medical need."  The line is not so bright.  Helphenstine's condition was not static for the entire time he was detained.  It fluctuated.  However, reviewing the evidence in the light most favorable to Plaintiff, the objective prong has been met and the Court will proceed with the Fourteenth Amendment analysis. *See Hinneburg v. Miron*, 676 F. App'x 483, 486-487 (6th Cir. 2017)("The objective prong is usually met in overdose cases where death results" where "several of the inmates, through sworn affidavits and depositions, testified as to the extreme nature of Hinneburg's intoxication, and [an inmate] specifically testified that she believed Hinneburg needed medical attention" ).  *See also Border v. Trumbull County*, 414 F. App'x 831, 837 (6th Cir. 2011) (detainee's medical need was sufficiently serious and obvious where he appeared "severely

intoxicated," "huddled and slumped over," had red and glazed eyes, "had difficulty walking and staying awake," "slurr[ed] his speech," and later died from a drug overdose).

**B.**

The subjective component turns upon the modified deliberate-indifference test articulated in *Trozzi*.  The Court must determine whether Plaintiff has presented sufficient evidence for a reasonable jury to conclude that: (1) a reasonable officer (knowing what the particular jail official knew at the time of the incident) would have known that Helphenstine was suffering from a serious medical need that posed an excessive risk to his health; and (2) the individual Defendants knew that non-intervention would create an unjustifiably high risk of harm to Helphenstine's health and ignored that risk. *Trozzi*, 29 F.4th at 757 - 758.   As set forth in *Trozzi*, this standard "ensur[es] that there is a sufficiently culpable mental state to satisfy the 'high bar' for constitutional torts grounded in a substantive due process violation. *Id.* at 758.

The Court notes that a deputy's awareness that a detainee is experiencing withdrawal does not automatically trigger constitutional protection.  Nor does it, in and of itself, "establish a triable issue of fact over deliberate indifference."  *Speers v. County of Berrien*, 196 Fed. Appx. 390 (6th Cir. 2006).

Moreover, symptoms of withdrawal do not always warrant hospitalization. Indeed, the Sixth Circuit has observed that withdrawal "typically may be managed in a prison setting and indeed frequently is managed there." *Id.*  It is well established in the Sixth Circuit that sending an inmate to the hospital is not the only way withdrawal may be treated within constitutional boundaries. *See e.g., Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018).

Caselaw in this context recognizes the spectrum of symptoms of withdrawal and measures those symptoms against the acts or omissions of the deputies involved.  The Court has

14

found deliberate indifference in cases in which an officer "was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, that he drew that inference, and chose to disregard the risk." *Spears v. Rutrh*, 589 F.3d 249, 255 (6th Cir. 2009).

For example, in *Burwell v. City of Lansing*, 7 F.4[th] 456 (6th Cir. 2021), the Sixth Court found that a detention officer acted with deliberate indifference when he admitted that he observed the detainee unconscious in a pool of his own vomit not one, but twice, yet rendered no aid until directed by another officer to do so. *Id*. at 472. *See also, Bertl v. City of Westland*, 2009 WL 247907 (6th Cir. 2009) at *6–7 (finding sufficient proof to establish deliberate indifference where a defendant nurse "observed [the detainee] lying face down on the floor of his cell, almost comatose, unresponsive and having seizure-like spasms" but "refused to enter the cell and take his vital signs" and "thereafter left the cell and did not return"); *Speers*, 196 F. App'x at 398 (concluding that jury could find defendant officers deliberately indifferent for failing to seek medical assistance for detainee who had collapsed and was "foaming at the mouth").

Conversely, the Sixth Circuit has declined to find deliberate indifference in situations in which an officer was perhaps negligent and imprudent but whose conduct did not rise to recklessness. For example, in *Burwell*, an officer who knew a detainee had epilepsy, observed him lying on the ground and failing to react to a restless cellmate and could not determine whether he was breathing, was not deemed to have acted with deliberate indifference. *Burwell*, 7 F.4[th] at 468-469. The Court noted that "[a] prudent officer likely would have taken further steps to ensure a detainee's safety….But her negligence does not establish a constitutional violation." *Id.* at 469.

In the same case, the Court found another officer to have negligently prolonged a detainee suffering but that her conduct did not "amount to a constitutional violation." *Id.* at 470.

That officer had four interactions with the detainee, including three cell checks. *Id.* During the second cell check, the detainee was unconscious on the floor. *Id.* During the next check, she observed no change and "assumed he was sleeping." *Id.* She later found him unresponsive and immediately called another officer for assistance. *Id.* at 462. That officer performed CPR; EMS arrived 8 minutes later. *Id.* The detainee was pronounced dead shortly after arriving at the hospital, about 25 minutes later. *Id.* The Court observed that this officer left the detainee unconscious in a pool of vomit for 42 minutes because she failed to check on him at regular intervals, per the jail's policy. *Id.* at 471. The Court further stated that "she certainly should have investigated further when she realized that [the detainee] had not moved in the roughly 85 minutes" between her cell checks. *Id.* However, the Court affirmed the district court's granting of summary judgment in her favor, stating "[s]uch cavalier treatment of detainees she had an obligation to protect was certainly negligent, maybe grossly so" but declined to find a constitutional violation. The Court concluded, "[h]er 'failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.*, *citing Winkler*, 893 F.3d at 898.

Similarly*, in Winkler*, the Sixth Circuit held that an officer was not deliberately indifferent for failing to take any further steps to care for a detainee who did not get up for breakfast, and later died of a perforated ulcer, although the officer knew that the detainee was withdrawing from drugs. 893 F.3d at 898. The Court noted that the "the better practice" would have been for the officer to determine why the detainee did not get up, and "her failure to do so might very well amount to negligence" but not deliberate indifference. *Id.*

With these precedents in mind, this Court will address the subjective component of Plaintiff's deliberate indifference claim for each officer individually. *Greene*, 22 F.4th at 607.

i.     **Deputy Marc Riley**

As set forth *supra*, on April 16, Deputy Riley entered Helphenstine's cell and observed vomit on the floor.  He asked Helphenstine if he wanted to see the doctor or go to the hospital, but Helphenstine said no. Instead, Helphenstine told Deputy Riley that he was "dope sick" and "just wanted to be in a cell by hisself  so he can get over it."  In accordance with Helphenstine's wishes, Deputy Riley moved Helphenstine to an isolation cell  where Helphenstine could be monitored.  He completed an Incident Report in order to advise other jail personnel about the reasons for the move.   That was Deputy Riley's one and only interaction with Helphenstine. Viewing these facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine. *Trozzi*, 29 F.4th at 758.

In arguing to the contrary, Plaintiff misstates Riley's testimony. She claims Riley testified "that [Dr.] Von Luhrte should have been called [when Helphenstine was found vomiting], and if he couldn't be reached, Helphenstine should have been taken to the hospital." [Docket No. 124]. That is incorrect. To the contrary, during his deposition, Riley was asked, "Well, … had you been unable to reach Dr. Von Luhrte, would you have taken Mr. Helphenstine to the hospital?" Riley replied, "I don't know." [Docket No. 107].   No reasonable juror could construe that testimony to be  unequivocally demonstrative of deliberate indifference.

ii.     **Deputy Ben Carver**

Deputy Ben Carver saw Helphenstine twice. On Tuesday, April 18, at 11:20 a.m., Carver observed Helphenstine in the medical isolation cell and thought "he looked good … his face, his color, it looked pretty good." [Deposition of Ben Carver, Docket No. 101, p. 10-13]. Helphenstine was not pale or bright red, was not sweating, was not shaking or trembling, and

was not complaining of nausea, vomiting or diarrhea. *Id.* Rather, Helphenstine was "just sitting up like he felt good." *Id.*

When Carver saw Helphenstine the second time, at 1:40 p.m., Helphenstine was still sitting up on a bench beside the door to the cell. *Id.* Viewing these facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine. *Trozzi*, 29 F.4th at 758.

Plaintiff maintains that Carver knew Helphenstine was in withdrawal and, therefore, he should have arranged for him to go to the hospital and by not doing so, acted deliberately indifferent and outside of constitutional bounds. Yet, as set forth *supra*, awareness of withdrawal is not tantamount to deliberate indifference.

### iii.    Deputy Jeffrey Thoroughman

Deputy Jeffery Thoroughman was one of the deputies who monitored Helphenstine and logged his observations on the Medical Watch Sheet. He also participated in administering CPR on Helphenstine. Viewing these facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine. *Trozzi*, 29 F.4th at 758.

In her response to Defendants' dispositive motion with respect to Deputy Thoroughman, Plaintiff maintains that Thoroughman knew Helphenstine was in withdrawal and, therefore, he should have arranged for him to go to the hospital and by not doing so, acted deliberately indifferent and outside of constitutional bounds. Yet, as set forth *supra*, awareness of withdrawal is not tantamount to deliberate indifference.

### iv.    Deputy Anthony Ruark

Deputy Anthony Ruark worked three shifts during the relevant time period. Like Deputy Thoroughman, Deputy Ruark was part of the team of deputies who monitored Helphenstine and recorded their observations on the Medical Watch Sheet.  During Ruark's shifts, he checked on Helphenstine 21 times, 39 times and 22 times. During his final check, when he could not get a response from Helphenstine, he, along with others, called an ambulance and administered CPR. It would appear from the record that Deputy Ruark merely did his job as the tragedy unfolded. Viewing these facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine and failed to act accordingly. *Trozzi*, 29 F.4th at 758.

In her response to Defendants' dispositive motion with respect to Deputy Ruark, Plaintiff argues that because he knew Helphenstine was experiencing withdrawal, he should have gotten him medical attention.  Yet, as set forth *supra*, awareness of withdrawal is not tantamount to deliberate indifference.

### v.    Deputy Amanda McGinnis

As set forth *supra*, Deputy Amanda McGinnis had quite a bit of interaction with Helphenstine.  Yet nothing in the record establishes that was reckless or deliberately indifferent. Indeed, viewing the facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine and failed to act accordingly. *Trozzi*, 29 F.4th at 758.

Further, Deputy McGinnis reached out to the facility's physician.  It would seem that this was the appropriate thing to do.  *See Berry v. Delaware County*, 796 Fed. Appx. 857, 861 (holding

that a deputy "did precisely what he should have done – he perceived something might be medically wrong [with a detainee] and he conveyed that to a medical professional).

Plaintiff, again, argues that because Deputy McGinnis knew Helphenstine was experiencing withdrawal, she should have gotten him medical attention. Yet, as set forth *supra*, awareness of withdrawal is not tantamount to deliberate indifference.

Plaintiff also maintains that because Helphenstine's condition worsened in the early hours of April 19 and because Deputy McGinnis was on duty and interacting with Helphenstine during that time, she is automatically deemed to have acted with deliberate indifference. However, there is no evidence that Deputy McGinnis perceived Helphenstine's condition was getting worse. To the contrary, she testified that she perceived that Helphenstine was stabilizing.

### vi.   Deputy Sandy Bloomfield

From the time Helphenstine was moved to the medical isolation cell until April 17, Deputy Sandy Bloomfield observed him a few times, during he was either laying down or siting up and talking with her. She did not interact with him again until sometime after 3:30 a.m. on April 19, when the deputies who found Helphenstine unresponsive, summoned her to assist. Viewing these facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine and failed to act accordingly. *Trozzi*, 29 F.4th at 758.

In her response to Defendants' dispositive motion with respect to Deputy Bloomfield, Plaintiff argues that because he knew Helphenstine was experiencing withdrawal, he should have gotten him medical attention. Yet, as set forth *supra*, awareness of withdrawal is not tantamount to deliberate indifference.

20

Plaintiff further asserts that Deputy Bloomfield "personally observed Helphenstine's deterioration in the early hours of April 19." [Docket No. 124]. This is a mischaracterization of Deputy Bloomfield's testimony. The four pages of deposition testimony cited by Plaintiff, p. 82-86, do not suggest such knowledge. Rather, on those pages, Plaintiff's counsel repeatedly asks Bloomfield to confirm what various entries on the observation log say. However, those entries were made by other deputies, not Deputy Bloomfield. Further, it is undisputed that she did not have any personal interaction with Helphenstine until sometime after 3:30 a.m. on April 19, by which time other deputies had already found Helphenstine unresponsive in the isolation cell. At best, the referenced pages from Bloomfield's deposition demonstrate she was aware that Helphenstine laid face-down on a bench after drinking some Ensure, but Bloomfield testified that did not signify to her that his condition was deteriorating; rather, she believed he laid face-down on the bench to prevent himself from choking, in the event the Ensure caused him to vomit. [Docket. No. 108, p. 82-86]. This simply does not rise to the level of culpability required by *Brawner* and *Trozzi*.

### vii.    Deputy John Byard

Deputy John Byard is a bailiff; he does not work at the LCDC. He was involved in transporting Helphenstine to his arraignment on April 18. According to his testimony, he spent approximately six minutes with Helphenstine in this context. As seen on the video of the arraignment, he approached Lewis County District Judge McCloud and told him that Helphenstine was "out of it" and probably detoxing from some drug, prompting Judge McCloud to instruct Deputy Byard to return Helphenstine to the LCDC. Immediately thereafter, Deputy Byard spent approximately five minutes walking Helphenstine back to the LCDC, where an unknown deputy jailer received Helphenstine from Byard. Viewing these facts in a light most

favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine. *Trozzi*, 29 F.4th at 758.

In seeking to cast Deputy Byard as acting with deliberate indifference in his limited interaction with Helphenstine, Plaintiff argues that he failed to follow the policy of seeking medical attention when transporting a sick detainee. Yet, it is well established that a failure to follow policies, without more, does not establish deliberate indifference. *Griffith*, 975 F.3d at 578.

### viii.   Deputy Andy Lucas

Deputy Andy Lucas had limited interaction with Helphenstine. He testified that his final interaction with Helphenstine ended with Helphenstine telling him he felt "pretty good now." Viewing these facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine. *Trozzi*, 29 F.4th at 758.

Moreover,  as set forth *supra*, awareness of withdrawal is not tantamount to deliberate indifference.

To the extent that Plaintiff suggests that Lucas' involvement with the training of other deputies, the training which she alleges was deficient, this argument cannot be the basis upon which to assess individual liability on Deputy Lucas.  *See Sexton v. Kenton County*, 702 F.Supp.2d 784, 793 (E.D.Ky. 2010).

### ix.   Jailer Jeff Lycans

Jailer Jeff Lycans had one interaction with Helphenstine on the morning of his arraignment. He testified that Helphenstine looked ok. Based upon this limited interaction and

his testimony, viewing these facts in a light most favorable to Plaintiff, these undisputed facts do not demonstrate that this Defendant knew of any "unjustifiably high risks of harm" to Helphenstine. *Trozzi*, 29 F.4th at 758.

      **x.**      **Lewis County Sheriff Johnny Bivens**

Plaintiff does not oppose the dismissal of her § 1983 claims against Lewis County Sheriff Johnny Bivens.

**C.**

There  is much testimony in the record regarding the policies at the LCDC and which officers knew what those policies required, and which officers followed the policies.  Plaintiff contends she easily overcomes summary judgment because of the confusion as to the policies. However, failing to follow internal policies, without more, does not constitute deliberate indifference. *Griffith*, 975 F.3d at 578.  Like the officer in *Burwell*, *supra*, failing to follow policies may be deemed negligent but does not amount to a constitutional violation.   *See also Young v. Campbell Cnty.*, 846 F. App'x 314, 328 (6th Cir. 2021) ("Most assuredly, Deputy Fassler could have and should have perceived [the plaintiff's] injuries if he had followed CCDC protocol[,] ... [b]ut there is no liability under a deliberate-indifference standard for what is arguably only negligent conduct."); *Martin v. Warren Cnty.*, 799 F. App'x 329, 340 (6th Cir. 2020), *reh'g denied* (Feb. 4, 2020) ("The failure to adhere to policies, without more, is only negligence." (*quoting Winkler*, 893 F.3d at 891–92)). "Under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

**D.**

To the extent that Plaintiff seeks to impose liability of Jailer Jeff Lykins in his individual capacity based upon his role as supervisor, her claim cannot withstand summary judgment.

It is well established that the doctrine of *respondeat superior* does not apply in the context of § 1983 *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658 (1978). The Sixth Circuit has explained, "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Reed v. Speck*, 508 F. App'x 415, 421 (6th Cir. 2012) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)) (internal quotation marks omitted). To prove liability, the plaintiff must demonstrate "[m]ore than simple negligence and a right to control employees." *Id.* (citing *Gregory*, 444 F.3d at 751). "To succeed on a failure to train or supervise claim, a plaintiff must show that the supervisor 'encouraged the specific incident of misconduct or in some other way directly participated in it.' " *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 712–13 (6th Cir. 2001)). In other words, the plaintiff "must prove that [the supervisors] did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory*, 444 F.3d at 751 (citation omitted).

Accordingly, the Sixth Circuit has declined to impose supervisory liability where the supervisor-defendant was unaware of his employees' allegedly unconstitutional conduct and there was no evidence to show his direct participation or encouragement. *See Reed v. Speck*, 508 F. App'x 415, 421 (6th Cir. 2012).

There is no evidence that Lycans personally participated in any deputy jailer's alleged failures. Further, there is no evidence that he authorized, directly or implicitly, in any deputy jailers' alleged deprivation of proper medical care. Nor do the facts establish "a breakdown in the proper workings of the department," and Lycans' knowledge of such a breakdown. *See*

*Taylor v. Mich Dept. of Corrections*, 69 F.3d 76 (6th Cir. 1995)(holding a prison warden liable under §1983 for an inmate's rape where the warden had actual knowledge of a breakdown in the proper workings and procedures of the jail).

As such, Lycans is entitled to summary judgment in this regard.

## VI.

Plaintiff alleges that the customs and policies of the LCDC were the "moving force" behind Helphenstine's tragic death. [Complaint, Docket No. 1, ¶ 24]. She maintains that Lewis County is the Defendant who bears the most liability in this case.

Lewis County can be liable only if it itself committed a constitutional violation; it cannot be vicariously liable for its employees. *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020). Further, it could commit that violation only if it has a policy or custom that caused the injury in question. *Id*.  Plaintiff can demonstrate that Lewis County had such a policy or custom, by alleging facts that show one of the following circumstances: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.*

As Lewis County points out, for the most part, the individual officers had an understanding what qualifies as a medical emergency and when, and if, a detainee experiencing withdrawal requires additional care. Deputy McGinnis testified that she would look for uncontrollable vomiting, uncontrollable diarrhea, unresponsiveness, "talking out of their head," and not eating or drinking as an indication that an inmate experiencing withdrawals had a medical emergency, and that such an inmate should be transported to the hospital. [Docket No. 98, p. 22-28].

Deputy Ruark testified that he knew to perform observation checks on inmates in the isolation cell (which is usually used for inmates going through withdrawal) every twenty minutes, "keep a close eye on them," and watch for signs such as vomiting severely or not responding to know whether the inmate presented a medical emergency, and, if so, to call Dr. Von Luhrte or paramedics. [Docket No. 100, p. 18-22].

Deputy Thoroughman testified that he knew to watch a withdrawing inmate for excessive vomiting, diarrhea, any kind of indication that their withdrawal was becoming lifethreatening, "and they don't want to really eat or do nothing. They just kind of want to lay around." He knew to take such an inmate to the hospital. [Docket No. 104, p. 5-9].

Deputy Carver knew to make sure a withdrawing inmate was not laying on his back, and to watch such an inmate for shaking, sweats and vomiting; if an inmate exhibited such symptoms, Deputy Carver knew to either call Dr. Von Luhrte, call EMS, or take the inmate to the hospital, depending on how bad the inmate's symptoms appeared to be. [Docket No. 101, p. 22-25].

This is not to say that the deputy jailers were one hundred percent clear about their obligations under the EMS policy nor do they proclaim expert medical knowledge. But their testimony does not establish an unawareness pertaining to withdrawal.

Even assuming that Plaintiff could show that the County's training of its jail personnel was inadequate, she has not presented proof of causation. To-wit, that this inadequacy resulted from deliberate indifference. *Winkler*, 893 F.3d at 902. To establish that the inadequate training resulted from deliberate indifference, a plaintiff must establish (1) "prior instances of unconstitutional conduct demonstrating that the County ... was clearly on notice that the training in this particular area was deficient and likely to cause injury," or (2) "a single violation of

federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation," *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008).  The evidence in the record does not establish either.

The Court also notes that in this Circuit, training deputies in CPR and first-aid only does not create a genuine dispute of material fact in the § 1983 context. *See Berry,* 796 Fed. Appx. at 866.

Viewing the record in the light most favorable to Plaintiff, she has not presented facts from which a jury could find that Lewis County had a policy or a custom that caused a violation of Helphenstine's constitutional right to adequate medical care.

## VII.

Dr. Von Luhrte seeks summary judgment as to the §1983 claim asserted against him.

"A plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Bowles v. Advanced Correctional Care*, 2020 WL 7048274, *8 (E.D. Ky. 2020). (internal citations omitted). The Court can only "judge [Dr. Von Luhrte's] actions based on the information that was available to [him at the time." *Id.*

Viewing the facts in a light most favorable to Plaintiff, she has not established that Dr. Von Luhrte acted with deliberate indifference.  He testified that he suggested Helphenstine go the hospital. He further testified that he was told Helphenstine refused to go. On that basis, he testified that he directed another form of treatment, including prescribing medication to alleviate

Helphenstine's symptoms.  Notably, the sick call sent sheet to him from the LCDC on April 17 does **not** include Helphenstine. [Sick Call Sheet, Docket No. 127-7].

Although Dr. Von Luhrte's decision not to investigate further may have been negligent, this is not tantamount to deliberate indifference. *See Winkler,* 893. F3d at 894.  Moreover, there is no evidence that Dr. Von Luhrte had reason to suspect that Helphenstine was going through anything but opiate withdrawal. In similar circumstances, the Sixth Circuit did not find constitutional liability. *Id.*

Plaintiff argues that Dr. Von Luhrte's testimony that he was told that Helphenstine refused to go to hospital is not credible, at best. She maintains that Defendant Lykins testified that an inmate would not be permitted to refuse transport to a hospital.  Plaintiff misstates Lykins' testimony. Contrary to what Plaintiff asserts in her responsive brief, Lykins testified that if an inmate is "bleeding profusely", he would tell him to go to the emergency room.  [Docket No. 103, p. 66-67]. He stated, "if he's bleeding that bad, then he needs to be seen by medical." *Id.* at p. 67.  He further testified that he would summon an ambulance if an inmate has a "seizure or heart attack, something like that." *Id.* at p. 16.

 The Court does not "weigh the evidence and determine the truth of the matter" at the stage of the proceedings. *Anderson*, 477 U.S. at 249. However,  the Court must consider whether the respondents have identified more than "[t]he mere existence of a scintilla of evidence in support of [the respondent's] position." *Id.* at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 250 (citations omitted). "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *Alba v. Marietta Memorial Hospital,* 202 F.3d 267, *3 (6th Cir.

2020). With respect to Plaintiff's theory that Dr. Von Luhrte is not to be believed and that he never ordered that Helphenstine be taken to a hospital and/or Helphenstine refused to go, the Court finds that Plaintiffs have failed to produce more than a mere scintilla of evidence to support that theory.

## VIII.

As Judge Caldwell concluded in *Bowles*,

> Having found no constitutional violations, summary judgment has been granted on all § 1983 claims in favor of the remaining defendants in this case. The § 1983 claims served as the sole basis for federal jurisdiction. Now without a federal hook, the Court declines to exercise supplemental jurisdiction over Bowles's state law claims. As has been shown above, there are significant state-law related issues in this case all related to complex and sensitive issues regarding negligence and medical care for prisons. The state courts, as a "surer-footed read[er] of applicable law," are best suited to resolve them.

*Bowles*, 2020 WL 7048274 at *10 (internal citations omitted).

Helphenstine may pursue his remaining claims in state court.

## IX.

The "Constitution ... erects a series of hurdles that allegations of prisoner mistreatment must clear before they proceed to a jury." *Id.*  This case is indeed a tragedy.  Helphenstine's death may well have been avoided had the deputies made different decisions in the crucial days and hours. However, "the Fourteenth Amendment does not permit claims against jail officials [and medical professionals] for negligence, that is, claims regarding what [they] *should* have known or *should* have done." *Id.*  A state actor's  failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as  a violation of the constitution.  On this narrow question—whether any of the defendants acted with deliberate indifference in their care of Chris Helphenstine—this Court cannot answer in the

29

affirmative. This is not to say that Plaintiff is without any remedy. But under the facts in the record and considering them in the light most favorable to her, such a remedy cannot be found under the rights afforded by the Constitution.

Accordingly, **IT IS HEREBY ORDERED**:

1) Defendant Tommy Von Luhrte's Motion for Partial Summary Judgment [Docket No. 74] be **OVERRULED WITHOUT PREJUDICE**;

2) Defendant Tommy Von Luhrte's Motion for Summary Judgment [Docket No. 94] be **SUSTAINED**;

3) Defendants' Motion for Summary Judgment [Docket No. 96] be **SUSTAINED** as to the 42 U.S.C. §1983 claims and **OVERRULED WITHOUT PREJUDICE** as to the state law claims; and

4) Defendant Tommy Von Luhrte's Motion for Joinder be **OVERRULED AS MOOT**.

A Judgment will be entered contemporaneously herewith.

This 5th day of May 2022.

Signed By:

_Henry R Wilhoit Jr._

**United States District Judge**